IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RENEE WILLIS, | CASE NO. 1:24-CV-00162-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Renee Willis challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 26, 2024, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Jan. 26, 2024). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Willis filed for SSI in February 2021, alleging a disability onset date of January 20, 2021. (Tr. 174). The claim was denied initially and on reconsideration. (Tr. 91-99). Ms. Willis then requested a hearing before an Administrative Law Judge. (Tr. 119). Ms. Willis (represented by counsel) and a vocational expert (VE) testified before the ALJ on February 22, 2023. (Tr. 40-76). On March 30, 2023, the ALJ determined Ms. Willis was not disabled. (Tr. 19-39). The Appeals

Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-11; *see* 20 C.F.R. § 416.1481).

## FACTUAL BACKGROUND

### I. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Willis was 56 years old on the alleged disability onset date and 58 years old at the administrative hearing. (Tr. 33). She obtained her GED and worked as a care associate in assisted-living settings, a cleaner for a fire and water damage restoration company, a daycare employee, and a hair braider. (Tr. 50-52).

### II. ADMINISTRATIVE HEARING

At the hearing, Ms. Willis testified about how her conditions, including diabetes, diabetic peripheral neuropathy, diabetic retinopathy, bilateral cataracts, recurrent abdominal pain and chronic constipation, hypertension, degenerative joint disease of the left hip and knee, and left-shoulder pain affect her ability to work. (Tr. 46-47). She lives in an apartment with her 31-year-old son. (Tr. 48). She can drive but her son typically drives her. (Tr. 49). She does not sleep well, experiences fatigue from her medications, and struggles to shower and dress herself unassisted. (Tr. 53, 55). She has issues in her left hip, both knees, and right elbow that her doctor attributes to her diabetic condition. (Tr. 54). Her doctor instructed her to take acetaminophen for pain. (*Id.*). Ms. Willis testified to falling often due to headaches and high blood pressure. (Tr. 55). In 2020, she started using a cane to ambulate. (*Id.*). She can stand in place for about five minutes if she can use her cane or hold onto something. (Tr. 64). She attends church and sometimes shops for groceries, but otherwise does not leave the home often. (Tr. 55).

To treat her diabetes, Ms. Willis takes insulin and Trulicity, and uses a continuous glucose monitor. (Tr. 56). She was recently diagnosed with neuropathy in her hands and feet; it occurs daily and results in pain that feels like getting shocked on the bottom of her feet. (Tr. 57-58). Her feet hurt more in the evening. (Tr. 58). For the pain, Ms. Willis takes gabapentin and keeps her feet elevated, though gabapentin has not improved her condition. (Tr. 58-59). The neuropathy in her hands also produces shock-like pain. (Tr. 61). It begins in the morning when she awakens and lasts about half the day. (Tr. 59-60). Her hands are more painful than her feet. (Tr. 60). When she experiences neuropathy in her hands, Ms. Willis struggles to pick up small objects like pennies and has difficulty maintaining her grip on objects such as a heavy cup. (*Id.*). She also has pain in her left hip and shoulder, both knees, and right elbow. (Tr. 62). The elbow pain is constant. (*Id.*). When her hip pain flares, it is painful to sit and walk. (*Id.*). The hip pain is aggravated by walking and improved if she can walk with a cane. (Tr. 62, 64). Ms. Willis has cloudy vision and has difficulty reading up close. (Tr. 61). Reading glasses help such that she has little difficulty. (*Id.*). She also has chronic constipation and experiences pain when eating and drinking. (Tr. 65-66).

The VE identified Ms. Willis's past relevant work as a residential aide and hair braider. (Tr. 70). The VE then opined that a person of Ms. Willis's age, education, and experience, with the functional limitations described in the ALJ's residual functional capacity (RFC) determination, could perform Ms. Willis's past relevant work and could perform work as a dishwasher, maintenance worker, and floor waxer. (Tr. 71-72; *see also* Tr. 27). The VE also testified that employers tolerate an employee being off task no more than 9% of the time and no more than one unexcused absence. (Tr. 73).

III.    Relevant Medical Evidence

Ms. Willis has a history of type-2 diabetes and hypertension. On August 24, 2020, she met with her family doctor, Charles Ondobo, M.D., for treatment. (Tr. 298). There, Ms. Willis endorsed joint pain. (Tr. 299). A physical examination revealed left-hip tenderness with a moderately reduced range of motion, but the other findings were normal. (Tr. 300). Dr. Ondobo counseled Ms. Willis on the importance of complying with her diabetic medication and self-monitoring her glucose levels, continued her diabetes-related medications, increased her dose of lisinopril to address essential hypertension, and provided referrals to orthopedic surgery for her hip pain and to gastroenterology for a colon screening. (Tr. 301). On August 27, Dr. Ondobo informed Ms. Willis that testing revealed moderately elevated blood sugar. (Tr. 304).

Ms. Willis returned to Dr. Ondobo's office on October 14, 2020, and reported she lost all her medications two weeks prior. (Tr. 306). She endorsed symptoms associated with diabetes, including blurred vision, urinary frequency, increased fatigue, nocturia, and polydipsia. (*Id.*). Dr. Ondobo instructed Ms. Willis to take her medications as ordered and counseled her to monitor her blood-glucose levels and maintain a regular exercise program. (Tr. 310).

At a diabetic eye examination on November 10, 2020, Ms. Willis endorsed daily frontal headaches and tearing in the eyes. (Tr. 313). Examination revealed mild non-proliferative diabetic retinopathy, bilateral retinal micro-aneurysms, cataracts that were not visually significant, and dry-eye syndrome. (Tr. 318-19).

On December 2, 2020, Ms. Willis met with Dr. Ondobo and stated she did not take her medications because she lost them and could not afford to buy them again. (Tr. 320). Her physical examination was normal. (Tr. 324). Dr. Ondobo refilled her medications. (Tr. 324-25).

On March 8, 2021, Ms. Willis returned to Dr. Ondobo's office, reported medication compliance, and complained of urinary frequency. (Tr. 328). A physical examination yielded normal findings. (Tr. 331). Dr. Ondobo counseled her on nutrition, diet, and physical activity and refilled her medications. (Tr. 333).

A colonoscopy performed March 31, 2021 revealed a few small diverticula in the sigmoid colon. (Tr. 484).

On June 2, 2021, Ms. Willis admitted to Dr. Ondobo that she was not compliant with taking her medications or with checking her blood sugar. (Tr. 335). A physical examination revealed normal findings. (Tr. 337). Dr. Ondobo referred Ms. Willis to a dietician, refilled her medications, and prescribed Lantus, a daily insulin injection. (Tr. 339).

On October 14, 2021, Dr. Ondobo again noted Ms. Willis was not compliant with testing her blood sugar but noted she was taking her medications as directed and her diabetic condition was improving. (Tr. 342-43). Ms. Willis did not complain of symptoms associated with diabetes. (Tr. 342). A physical examination showed normal findings. (Tr. 345). Her blood-test results revealed a Hemoglobin A1C (HbA1c) of 9.3% (normal is less than 5.7%). (Tr. 349).

On December 2, 2021, Ms. Willis met with Dr. Ondobo and described intermittent piercing and throbbing pain in her right elbow but without radiation; she also complained of numbness or tingling in the fingers lasting three months. (Tr. 351). She also described experiencing constipation, which is aggravated by her medication change and lack of sleep, and increased fatigue. (*Id.*). She reported trying two different laxatives without improvement. (*Id.*). Her physical examination yielded normal findings. (Tr. 356). Dr. Ondobo assessed her with type-2

diabetes mellitus with diabetic neuropathy and prescribed gabapentin for pain and polyethylene glycol for constipation. (*Id.*).

In January 2022, Ms. Willis complained of chronic, intermittent bilateral foot pain, decreased range of motion, paresthesia, and stiffness. (Tr. 376). She located the pain in the great toes and at the bottom and sides of her feet and described it as an aching, burning discomfort with localized, sharp, stabbing pain, with a mild-to-moderate severity. (*Id.*). She reported her symptoms were aggravated by standing, walking, weather changes, and her shoe gear. (*Id.*) Ms. Willis also described decreased mobility, difficulty with shoes and socks, erythema, joint tenderness, limping, night pain, and pain after activity. (*Id.*). A physical examination revealed a normal gait and normal ankle and foot strength but also found abnormal bilateral alignment of the forefoot, tenderness at the toenails, neuropathy, ankle instability, decreased active range of motion, and abnormal posterior tibial pulses. (Tr. 386). The medical provider assessed Ms. Willis with nail dystrophy, debrided her toenails, and prescribed capsaicin in topical form for pain. (Tr. 388).

On February 19, 2022, Ms. Willis presented at the emergency department with complaints of chest pain and tightness and lower back pain. (Tr. 523). Her troponin level and EKG testing were normal, a chest X-ray showed no evidence of acute cardiopulmonary process, and she denied pain on re-examination. (Tr. 524). Ms. Willis was discharged home and advised to follow up. (*Id.*).

On February 21, 2022, Ms. Willis met with Dr. Ondobo for a follow-up appointment. (Tr. 395). He described her diabetic condition as stable and hypertension as "getting worse." (*Id.*). Ms. Willis admitted to occasionally forgetting to take her medications. (Tr. 398). A physical examination yielded normal findings. (*Id.*). Dr. Ondobo adjusted her medications to include metformin, insulin, and Trulicity. (Tr. 395). Ms. Willis's HbA1c measured 10.9. (Tr. 466).

On March 24, 2022, Dr. Ondobo described Ms. Willis's diabetic condition as stable but increased her dosage of Trulicity, added Jardiance to her prescription regimen, and provided her with continuous glucose-monitoring supplies. (Tr. 414). A physical examination yielded normal findings. (Tr. 413-14).

On April 12, 2022, Ms. Willis presented at the emergency department for chest tightness, nausea, and a headache. (Tr. 530). She described two weeks of increased chest tightness exacerbated by physical activity and better with rest. (*Id.*). Ms. Willis denied abdominal pain but endorsed additional gastrointestinal symptoms of bloating, excessive burping, increased flatulence, and a bad taste in her mouth. (*Id.*). She reported an increase in headaches and dizziness that she associated with her GI symptoms and kept her eyes closed during most of the examination due to a sensation of the room spinning. (*Id.*).

Ms. Willis returned to Dr. Ondobo's office on May 19, 2022, complaining of abdominal cramps and nausea with Trulicity. (Tr. 417). Physical examination was normal. (Tr. 420). Dr. Ondobo discontinued Trulicity and continued her other medications. (Tr. 421). Ms. Willis's HbA1c measured 8.7. (Tr. 426).

On September 15, 2022, Ms. Willis met with Dr. Ondobo for a follow-up appointment. (Tr. 429). Dr. Ondobo noted medication compliance and described her diabetic condition as improving and her hypertension as stable. (*Id.*). A physical examination yielded normal findings. (Tr. 434). Ms. Willis's HbA1c measured 7.7. (Tr. 462).

On January 24, 2023, Ms. Willis returned to Dr. Ondobo's office complaining of recurrent abdominal pain and denied improvement with stopping Trulicity. (Tr. 441). She also endorsed feeling a decreased appetite, constipation, and bloating. (Tr. 445). A physical examination revealed

mild abdominal fullness and mildly hypoactive bowel sounds. (Tr. 446). A diabetic foot screening

yielded normal findings. (*Id.*). Dr. Ondobo prescribed psyllium husk and Senna Lax for Ms.

Willis's abdominal issues and re-prescribed Trulicity. (Tr. 451). Her HbA1c dropped to 5.9. (Tr.

460).

## IV.    MEDICAL OPINIONS

On July 22, 2021, Ms. Willis attended a consultative medical evaluation with Dorothy

Bradford, M.D. (Tr. 284). There, she endorsed insulin-dependent diabetes and complained of

arthritic pain in her left hip, shoulder, and knee but denied foot pain and vision loss. (*Id.*). Dr.

Bradford noted Ms. Willis used a cane for support. (*Id.*). A physical examination yielded normal

findings. (Tr. 285). Ms. Willis's gait was even and regular with the use of her cane. (*Id.*). Dr.

Bradford determined Ms. Willis has degenerative joint disease in the left knee and hip and insulin-

dependent diabetes without end-organ damage and, thus, should be restricted to sedentary activity.

(*Id.*).

On September 30, 2021, a State agency medical consultant reviewed Ms. Willis's medical

records and determined she did not have any severe medical impairments and, thus, did not assess

her RFC. (Tr. 91-94). On January 21, 2022, a second State agency medical consultant reviewed

additional medical records and reached the same conclusion. (Tr. 95-99).

## V.    OTHER RELEVANT EVIDENCE

Ms. Willis completed an Adult Function Report detailing how her conditions affect her

activities. (Tr. 211-18). Her medications make her feel dizzy and tired and cause bellyaches. (Tr.

211). She has headaches, numbness and tingling in her feet, and her pain in her left hip and arm

is aggravated by walking a lot. (*Id.*). The pain keeps her awake at night. (Tr. 212).

Her left-arm pain makes it difficult to get dressed and bathe on her own, but she can care for her hair, feed herself, and use the toilet without assistance. (Tr. 212). She prepares simple foods a few times a week, including sandwiches and frozen meals. (Tr. 213). Meal preparation is limited because she cannot stand as long as she once did. (*Id.*). Twice weekly, Ms. Willis completes household chores, including dusting, general cleaning, and sweeping. (*Id.*). She does laundry once every two weeks. (*Id.*).

Ms. Willis sometimes drives and can take public transportation. (Tr. 214). She shops at the grocery store for about an hour weekly. (*Id.*). She enjoys watching television and reading. (Tr. 215). Ms. Willis attends church and socializes with others daily, either in person or by phone, text, video chat, or mail. (*Id.*). She cannot travel much, walk long distances, or do things that take a lot of effort or energy. (*Id.*). Her conditions affect her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, see, remember, complete tasks, and use her hands. (Tr. 216). The intensity of her hip pain dictates how far she can walk before needing to rest, but she estimates she can walk for about 100 feet. (*Id.*).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Willis had not engaged in substantial gainful activity since February 18, 2021, the date of her application. (Tr. 25). At Step Two, the ALJ identified the following severe impairments: type-2 diabetes mellitus, hypertension, and obesity. (*Id.*). At Step Three, the ALJ found Ms. Willis did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id.*).

The ALJ determined Ms. Willis's RFC as follows:

10

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except occasionally climb ladders, ropes, or scaffolds, frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, and should avoid unprotected heights and dangerous machinery with unprotected moving mechanical parts.

(Tr. 27).

At Step Four, the ALJ found Ms. Willis is capable of performing her past relevant work as a residential aide and hair braider. (Tr. 33). The ALJ also determined other jobs exist in significant numbers in the national economy that Ms. Willis can perform. (Tr. 34). Therefore, the ALJ determined Ms. Willis was not disabled. (*Id.*).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x. 636, 641 (6th Cir. 2013) (cleaned up).

11

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

ANALYSIS

Ms. Willis alleges the ALJ committed two related errors when crafting the RFC. First, she claims the ALJ did not properly evaluate Dr. Bradford's medical opinion and failed to impose limitations consistent with that opinion. (ECF #10 at PageID 687) (citing 20 C.F.R. §§ 416.945 and 416.920c). Second, citing *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908 (N.D. Ohio 2008), and its progeny, and *Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-CV-2632, 2020 WL 5423967 (N.D. Ohio Sept. 10, 2020), Ms. Willis claims the ALJ impermissibly relied on her own lay interpretation of the medical evidence to determine Ms. Willis's remaining functional abilities after the ALJ found Dr. Bradford's opinion, the only one available in the case record, unpersuasive. (ECF #10 at PageID 690).

I begin with Ms. Willis's argument that the ALJ improperly analyzed Dr. Bradford's medical opinion and failed to impose limitations consistent with that opinion.

Because Ms. Willis filed her application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 416.927(a)(1).

13

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors," supportability and consistency. 20 C.F.R. § 416.920c(a). With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion, the more persuasive the medical opinion will be. *Id.* at § 416.920c(c)(1). Regarding consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. *Id.* at § 416.920c(c)(2). An ALJ must explain how she considered those factors and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3).

The ALJ evaluated Dr. Bradford's medical opinion as follows:

Dr. Bradford opined the claimant should be restricted to sedentary activity. The undersigned finds this unpersuasive because Dr. Bradford based it on a single evaluation, and it is internally inconsistent. Although the claimant used a cane, she showed normal gait and station, full range of motion and 5/5 strength throughout, and normal and symmetric reflexes, no sensory deficits, no joint deformity, and negative straight leg raise testing. This is also inconsistent with other unremarkable

14

examinations that showed normal system functioning, including normal strength and gait, and no indication a cane or other assistive device was prescribed or medically necessary.

(Tr. 32).

This explanation, though brief, provides all the analysis necessary to meet the articulation requirements in 20 C.F.R. § 416.920c. The ALJ analyzed the consistency factor by emphasizing that the opinion is inconsistent with normal findings from the physical examination Dr. Bradford conducted and other physical examinations found throughout the entire record. On this record, where Ms. Willis's medical providers very infrequently documented even mildly abnormal objective medical findings, I conclude the ALJ's analysis is sufficient and substantial evidence supports the ALJ's conclusion that Dr. Bradford's opinion is unpersuasive. Because the ALJ properly analyzed Dr. Bradford's opinion, the ALJ did not have to impose limitations consistent with that opinion.

Ms. Willis faults the ALJ for not comparing Dr. Bradford's medical opinion with the few objective findings suggesting impairment, consisting of left-hip tenderness and a reduced range of motion in August 2020, elbow pain in December 2021, an abnormal bilateral foot examination in January 2022 where she reported pain, her diagnosis of diabetic neuropathy, and her elevated HbA1c measurements. (ECF #10 at PageID 688-89). According to Ms. Willis, this evidence "documents impairments of left hip pain and chronic diabetic neuropathy of the feet that are consistent with a sedentary exertion level." (*Id.* at PageID 689). But the existence of contrary evidence does not mean the ALJ's determination lacked substantial evidence. *See Jones*, 336 F.3d at 477 ("Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the

conclusion reached by the ALJ."). In the face of this longitudinal record reflecting mostly normal physical examinations and few, sporadic complaints of pain, substantial evidence supports the ALJ's evaluation of Dr. Bradford's medical opinion.

Moreover, the ALJ acknowledged those abnormal findings elsewhere in her decision. At Step Two, the ALJ addressed the January 2020 left hip X-ray showing minimal arthritis and noted "no evidence of updated testing or ongoing treatment for left hip or left knee arthritis." (Tr. 25). Similarly, the ALJ acknowledged Ms. Willis's singular complaint of elbow pain to her doctor and the contemporaneous normal physical examination. (Tr. 30). Notably, Ms. Willis did not follow up for further treatment or testing or otherwise complain of elbow pain thereafter. The ALJ also addressed the abnormal findings from a diabetic foot examination in January 2022 and compared that with the normal foot examination one year later. (*Id.*). I note that between those two examinations, Ms. Willis did not seek treatment or otherwise complain of foot pain. Although the ALJ did not address these findings when evaluating Dr. Bradford's medical opinion, her assessment of the findings elsewhere in the decision refutes Ms. Willis's suggestion that the ALJ ignored this evidence. (ECF #10 at PageID 689).

Next, I address Ms. Willis's argument that the ALJ assessed her RFC without the benefit of a medical opinion, thus impermissibly relying on her own lay interpretation of the medical evidence. A claimant's RFC is an assessment of the most a claimant can do despite her limitations. 20 C.F.R. § 416.945(a)(1). The ALJ is charged with the responsibility for assessing a claimant's RFC. *Rudd v. Comm'r of Soc. Sec.*, 531 F.App'x 719, 728 (6th Cir. 2013). In that assessment, the ALJ must consider all relevant evidence in the case record, including medical records, medical opinions, and the claimant's description of her limitations. 20 C.F.R. § 416.945(a)(3). The ALJ "is

only required to incorporate those limitations which he deemed credible" and may reject opined limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F.App'x 582, 585 (6th Cir. 2010).

Authoritative case law establishes that an ALJ is not required to base her RFC determination on a particular medical opinion. In *Mokbel-Aljani v. Comm'r of Soc. Sec.*, 732 F.App'x 395 (6th Cir. 2018), the Sixth Circuit reiterated its rejection of the argument that an RFC cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *Id.* at 401 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F.App'x 435, 442-43 (6th Cir. 2017)) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work."); *see also Rudd*, 531 F.App'x at 728 (explaining that requiring an ALJ to base an RFC determination on "a physician's opinion" would, in effect, confer the statutory responsibility to determine if an individual is under a disability from the ALJ to a medical source). More recently, in *Reinartz v. Comm'r of Soc. Sec.*, 795 F.App'x 448 (6th Cir. 2020) (mem.), the Sixth Circuit rejected the claimant's argument that the ALJ may not make a work-capacity finding without a medical opinion that reaches the same conclusion. *Id.* at 449. The *Reinartz* Court noted the ALJ considered two medical opinions, one of which opined as to impairments in memory and processing due to anxiety and prompted the ALJ to limit the claimant to "simple, routine and repetitive tasks." *Id.*

Ms. Willis argues that the ALJ was nevertheless required by *Deskin* to obtain another medical opinion. (ECF #10 at PageID 689-90). In *Deskin*, the court reviewed a case in which the claimant had multiple spinal impairments and extensive treating relationships with multiple doctors, but no treating physician provided a medical opinion with a statement about what she

17

could still do based on the physician's findings. *Deskin*, 605 F.Supp.2d at 910. There was one medical opinion a state agency medical consultant offered two years before the ALJ made an RFC finding and that consultant's opinion was reached without the benefit of two years' worth of additional medical records. *Id.* at 911. The ALJ did not order a consultative examination or have a medical expert testify at the hearing and proceeded to decide the case based on his analysis of the medical records, paying little attention to the consultant's opinion. *Id.*

The *Deskin* Court stated that "in making the [RFC] finding, the ALJ may not interpret raw medical data in functional terms." *Id.* at 912. The court acknowledged both the claimant's burden of proof to establish the existence and severity of the limitations caused by her impairments, *see* 20 C.F.R. § 416.912, but noted the ALJ's parallel responsibility to develop the administrative record, *see* 20 C.F.R. § 416.945(a)(3), and the ALJ's discretion to order a consultative examination or call a medical expert at the hearing. *Id.* at 911. Balancing these overlapping roles, the court established the following general rule:

> . . . [when] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only outdated non-examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such an opinion only in a limited number of cases [in which] the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

*Id.* (cleaned up). The *Deskin* Court noted that ultimately a finding of no disability may be appropriate but concluded that substantial evidence for that finding did not exist on the record because extensive MRI findings of diffuse and substantial degenerative disc disease throughout Deskin's spine provided objective medical evidence that required a medical source's opinion to assist in translating raw medical data into functional terms. *Id.*

18

As the Commissioner states, many district courts agree that *Deskin* is not consistent with governing Sixth Circuit precedent. (ECF #12 at PageID 700-01; *see also Carr v. Comm'r of Soc. Sec.,* 5:23-CV-00187-BMB, 2024 WL 1556398, at *11 (N.D. Ohio Jan. 8, 2024), *report and recommendation adopted,* 2024 WL 1343473 (N.D. Ohio Mar. 30, 2024) (collecting district cases and discussing various Sixth Circuit cases)). But there is some support that *Deskin* applies, and thus the ALJ should obtain another medical opinion, in very narrow circumstances.

In *Falkosky,* No. 1:19-CV-2632, 2020 WL 5423967 (N.D. Ohio Sept. 10, 2020), two state agency medical consultants determined there was insufficient evidence to evaluate Falkosky's disability claims. *Id.* at *2. Without the benefit of any medical opinion, the ALJ then assessed the claimant's RFC and inferred from the limited treatment record that he was able to perform medium exertion work during the relevant period. *Id.* at *8. The *Falkosky* Court acknowledged *Deskin* was persuasive, not controlling, authority but that its reasoning made good sense in Falkosky's case. *Id.* at *6. Relevantly, the court noted there were no medical opinions to analyze, none of the treatment notes the ALJ referred to provided any assessment of Falkosky's functional abilities (they only documented symptoms and treatment recommendations), and there was very little discussion in the evidence of how the Falkosky's symptoms affected his daily activities. *Id.* The court stated, "it is difficult to understand how the ALJ gleaned Falkosky's functional abilities from the symptoms and treatments (or lack thereof) documented in his physicians' notes." *Id.* It determined ALJ's RFC assessment was the product of his own extrapolation from the limited medical records and concluded this was not a case showing relatively little physical impairment such that the ALJ could make a commonsense judgment about functional capacity. *Id.* at *8; *see id.* at *8 n.4 ("Falkosky's records before the date last insured show that his fingers were locking; that

19

he had degenerative changes in his hands; and that he'd been diagnosed with carpal tunnel syndrome. It cannot be said that this is only a 'little' physical impairment. Even the state agency reviewers found that Falkosky's carpal tunnel syndrome was severe.") (internal citations omitted).

Similar to *Falkosky*, the ALJ here did not have any medical opinions assessing Ms. Willis's functional abilities and limitations, and only Dr. Bradford's sparse opinion about her functional exertion level. Applying *Deskin* to the facts of this case, Ms. Willis's case *is* such a case showing relatively little physical impairment such that the ALJ could make a commonsense judgment about functional capacity. As addressed above, the medical providers very infrequently documented mildly abnormal objective medical findings, consisting of left hip tenderness and reduced range of motion in August 2020, reported elbow pain in December 2021, an abnormal bilateral foot examination in January 2022. Though Ms. Willis regularly attended medical appointments, she did not regularly complain of hip, elbow, or foot pain.

Case law from this court suggests the ALJ's decision was reasonable. In *Winans v. Comm'r of Soc. Sec.*, 5:22-cv-01793, 2023 WL 7622634, at *3 (N.D. Ohio Nov. 15, 2023), the district court repeated the holding *Landsaw v. Sec. of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986), that an ALJ does not need to order a consultative examination "unless the record establishes that such an examination is necessary to enable the [ALJ] to make the disability decision." The court in *Winans* determined there was so little evidence of the claimant's back and joint problems that the ALJ could determine that those problems were not disabling even without a consultative examination or other medical opinion. *Id.* at *4. There, the claimant's back and joint problems were supported by only a treatment note and two x-ray results. *Id.* The treatment note made no mention of how severe those symptoms were, and the x-ray results were the only medical testing in

the record supporting his impairments. *Id.* Relying on the paucity of evidence and lack of

meaningful treatment history, the court concluded there was substantial evidence supporting the

non-disability finding. *Id.* Because substantial evidence supported that finding, the ALJ did not

need to seek another medical opinion. *Id.* While the *Winans* court did not rest its holding on

*Deskin*, it determined that applying *Deskin* would not change the outcome because the medical

evidence showed relatively little physical impairment and the ALJ can render a commonsense

judgment about functional capacity, an exception articulated in *Deskin*. *Id.* Similarly here, the

medical record shows little physical impairment. On this set of facts, Ms. Willis has not shown the

ALJ erred in the application of proper legal standards or that the ALJ's decision is not supported

by substantial evidence.

### Conclusion & Recommendation

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental

security income.

Dated: October 9, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and**
**Recommendation, a party may serve and file specific written objections to the**

proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).